UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

| RICHARD LYNN HENSLEY | ) | |
|---|---|---|
| | ) | No. 2:01-CV-142 |
| V. | ) | *District Judge Greer* |
| | ) | *Magistrate Judge Inman* |
| ANTHONY MILES, *ET AL*. | ) | |

REPORT AND RECOMMENDATION

This suit is a declaratory judgment action to determine plaintiff's entitlement to uninsured/underinsured motorist coverage benefits under various policies of insurance. The majority of issues framed by the complaint have been dealt with in prior orders, first by Senior District Judge Hull and later by District Judge Greer. The only issue remaining is whether the Arkansas Property and Casualty Guaranty Fund ("Arkansas") owes benefits (in the nature of uninsured motorist coverage) to the plaintiff, Richard Hensley ("Mr. Hensley"). Both Mr. Hensley and Arkansas have filed Motions for Summary Judgment [Docs. Nos. 139, 142]. District Judge Greer has referred these Motions for Summary Judgment to the Magistrate Judge for a recommendation regarding the appropriate disposition. [*See,* Order, Doc. 144]. Oral arguments were held on December 6, 2004.

There are no factual issues. The dispositive issues involve either construction of insurance contracts or questions of law; in short, it is appropriate to dispose of this matter by summary judgment.

The purpose of this declaratory judgment action is to determine if Mr. Hensley is entitled to uninsured motorist benefits contained in a policy issued by Legion Insurance Company ["Legion"]. Mr. Hensley was a partner with Ms. Jo Hartley, who was the titled owner of the tractor-trailer truck. The truck was titled in the Commonwealth of Virginia but garaged – or "headquartered," if you will – in the State of North Carolina. Mr. Hensley was a resident of North Carolina and was a partner with Ms. Hartley in a business known as H & H Logistics. Mr. Hensley and Ms. Hartley leased their tractor-trailer truck to Fikes Trucking Company, Inc., of Arkansas and hauled cargo on behalf of Fikes Trucking Company. Pursuant to the contract between Fikes Trucking Company, Inc., and H & H Logistics, Fikes was obligated to procure certain insurance. Specifically, Fikes purchased two policies, one from Lancer Insurance Company, and the other from Legion Insurance Company.

On July 5, 2000, Mr. Hartley was hauling a load of cargo for Fikes Trucking Company, using the aforesaid truck, when he was involved in a violent collision on Interstate 81 in Sullivan County, Tennessee, with a vehicle driven by Anthony Miles. Mr. Miles, driving a rental car owned by Enterprise Rent-A-Car, Inc. ("Enterprise"), was northbound on Interstate 81 when he lost control, crossed the entire median, and crashed into Mr. Hensley's truck. Mr. Hensley was seriously injured. A tort action ultimately was filed in this Court (Civil Action No. 2:01-CV-124) and remains pending.

Mr. Miles was uninsured.

The owner of the car driven by Mr. Miles, Enterprise Rent-A-Car, was self-insured pursuant to Tenn. Code Ann. § 55-12-111(a).

The Lancer policy admittedly has uninsured motorist coverage in the amount of $55,000, a fact which no party, including Lancer, disputes. The only issue concerns whether or not the Legion policy afforded uninsured motorist coverage to Mr. Hensley, and that is hotly contested.

Legion Insurance Company was declared insolvent and thus has no assets with which to pay any claims of its insureds or third-party claimants. Because of Legion's insolvency, plaintiff filed suit against the Arkansas Property and Casualty Guaranty Fund, a creature of Arkansas statute, which will pay claims of Legion's insureds and third-party claimants (up to a set statutory limit) if those claims are "covered" claims as defined by § 23-90-102 of the Arkansas Code.

Obviously, the initial question that must be decided before all others is whether or not the Legion policy afforded uninsured/underinsured motorist coverage to the plaintiff in light of the circumstances described above. If it does not, then Arkansas should be dismissed from this suit since plaintiff has no rights against Arkansas beyond those he would have had against Legion. In other words, Arkansas stands in Legion's corporate shoes as far as its basic liability to Mr. Hensley is concerned. If this Court determines that the Legion policy afforded uninsured/underinsured motorist coverage to

3

the plaintiff, then the Court must go further and determine if Arkansas is required to satisfy Mr. Hensley's claims under the Legion policy, subject to the statutory limits.

The two policies procured by Fikes Trucking Company were intended to cover different aspects of Mr. Hensley's use of the tractor-trailer truck. The Lancer policy was intended to cover the truck while it was actually carrying cargo on behalf of Fikes. The Legion policy, on the other hand, was intended to cover the truck while it was "dead-heading," i.e., carrying no cargo and being used merely for transportation. Arkansas makes two arguments in support of its insistence that the Legion policy afforded no uninsured motorist coverage on the truck (and, by extension, to Mr. Hensley) as a result of the accident that occurred on July 5, 2000. First, Arkansas argues that the Legion policy flatly excluded any coverage while the truck was being used to "carry property in any business." Second, Arkansas argues that even if the Legion policy did cover the accident, nevertheless its uninsured motorist coverage was not triggered under the terms of the policy.

Arkansas's first argument can be disposed of rather quickly. The policy undeniably contains a Change Endorsement dated October 1, 1991, which refers to insurance coverage for "non-trucking use." In pertinent part, that Change Endorsement reads as follows:

> Liability Coverage for a covered "auto" described in the Schedule is changed as follows:
>
> 1. The following exclusions are added:
4

Case 2:01-cv-00142   Document 154   Filed 12/07/04   Page 4 of 12   PageID #: 96

the plaintiff, then the Court must go further and determine if Arkansas is required to satisfy Mr. Hensley's claims under the Legion policy, subject to the statutory limits.

The two policies procured by Fikes Trucking Company were intended to cover different aspects of Mr. Hensley's use of the tractor-trailer truck. The Lancer policy was intended to cover the truck while it was actually carrying cargo on behalf of Fikes. The Legion policy, on the other hand, was intended to cover the truck while it was "dead-heading," i.e., carrying no cargo and being used merely for transportation. Arkansas makes two arguments in support of its insistence that the Legion policy afforded no uninsured motorist coverage on the truck (and, by extension, to Mr. Hensley) as a result of the accident that occurred on July 5, 2000. First, Arkansas argues that the Legion policy flatly excluded any coverage while the truck was being used to "carry property in any business." Second, Arkansas argues that even if the Legion policy did cover the accident, nevertheless its uninsured motorist coverage was not triggered under the terms of the policy.

Arkansas's first argument can be disposed of rather quickly. The policy undeniably contains a Change Endorsement dated October 1, 1991, which refers to insurance coverage for "non-trucking use." In pertinent part, that Change Endorsement reads as follows:

> Liability Coverage for a covered "auto" described in the Schedule is changed as follows:
>
> 1. The following exclusions are added:

4

Case 2:01-cv-00142   Document 154   Filed 12/07/04   Page 4 of 12   PageID #: 96

This insurance does not apply to:

a. A covered "auto" while used to carry property in any business.

b. A covered "auto" while used in the business of anyone to whom the "auto" is rented.

Inasmuch as Mr. Hensley undeniably was carrying cargo on behalf of Fikes Trucking Company, that cargo was "property in any business" and therefore implicated the exclusionary provision of the Change Endorsement. However, that Change Endorsement by its own terms was limited to *liability* coverage; uninsured motorist coverage, or any other coverages for that matter, are notably unmentioned. Therefore, the Change Endorsement with respect to carrying property in a business is inapplicable to the uninsured motorist coverage of the Legion policy. All other questions aside, the uninsured motorist coverage of the Legion policy was applicable on July 5, 2000, notwithstanding that Mr. Hensley was carrying cargo on behalf of Fikes Trucking.

Arkansas's argument that the uninsured motorist coverage in the Legion policy was not triggered by the accident is more complicated. Uninsured/underinsured motorist coverage in the Legion policy is provided by yet another Change Endorsement, and reads as follows:

**A. Coverage**
1. We will pay all sums the "insured" is legally entitled to recover as compensatory damages from the owner or driver of an "uninsured motor vehicle" or an "underinsured motor vehicle". The damages must result from "bodily injury" sustained by the "insured"

5

caused by an "accident". The owner's or driver's liability for these damages must result from the ownership, maintenance or use of the "uninsured motor vehicle" or the "underinsured motor vehicle".

. . . .

**F. Additional Definitions**
As used in this endorsement:

. . . .

3.  "Uninsured motor vehicle" means a land motor vehicle or trailer

    a.  For which no liability bond or policy at the time of an "accident" provides at least the amounts required by the applicable law where a covered "auto" is principally garaged;
    b.  For which an insuring or bonding company denies coverage or is or becomes insolvent; or
    c.  That is a hit-and-run vehicle and neither the driver nor owner can be identified. The vehicle must hit an "insured", a covered "auto" or a vehicle an "insured" is "occupying".

    However, "uninsured motor vehicle" does not include any vehicle:

    **(1)** Owned or operated by a self-insurer under any applicable motor vehicle law, except a self-insurer who is or becomes insolvent and cannot provide the amounts required by that motor vehicle law;
    . . . .

**4.** "Underinsured motor vehicle" means a land motor vehicle or trailer for which the sum of all liability bonds or policies at the time of an

6

> "accident" provides a limit that is less than the amount of an "insured" is legally entitled to recover as damages caused by the "accident;
>
> However, "underinsured motor vehicle" does not include any vehicle:
>
> **a.** Owned or operated by self-insurer under any applicable motor vehicle law;
>
> . . . .

Although Mr. Miles was uninsured, the vehicle he was driving was self-insured by Enterprise Rent-A-Car Company. And, as Hamlet said, "there's the rub"; Arkansas argues that, inasmuch as the Enterprise vehicle was self-insured, Legion's uninsured motorist coverage was never triggered.

Enterprise has been dismissed from the underlying tort suit. Therefore, its self-insurance (or even its liability insurance, if it had same) is utterly irrelevant. As far as Enterprise is concerned, there was and is no insurance coverage available to Mr. Miles. With respect to insurance coverage, there would have been no difference if Mr. Miles been driving his own, and uninsured, vehicle. If there is no insurance, then there is no insurance. What is the difference between insurance that never existed and insurance that is unavailable, or inapplicable? The answer, obviously, is that there is no difference. This conclusion is confirmed by paragraph (F)(3)(b) of the Legion Change Endorsement regarding uninsured motorist coverage: "for which an insurance or bonding company denies coverage or is or becomes insolvent . . . ." Clearly the Legion policy contemplated the possibility that its uninsured motorist coverage would

7

apply if the tortfeasor's liability insurance company became insolvent or denied coverage to its insured. When Enterprise was dismissed as a defendant, its self-insurance left with it; it presents the same situation that would have occurred if Miles had liability coverage with a company who denied coverage or became insolvent.

But the Legion policy explicitly excludes from the definition of an uninsured motorist vehicle any vehicle "*owned* . . . by a self-insurer . . . ," and Arkansas seizes upon this language in arguing that the Legion uninsured motorist coverage did not come into play.

Many insurance policies describe their coverages in terms of vehicles, rather than in terms of the people who operate them, and this situation points out the illogic, harshness and injustice that might occur when defining coverages in terms of the machine as opposed to the operator thereof. Bearing in mind that the purpose of uninsured motorist coverage is to protect an insured from the misfortune of being injured by a motorist with no assets or insurance to satisfy an award of damages, this potential hole in uninsured motorist protection created by Legion's definition of uninsured motorist (and likely many other insurance policies as well) surely was not intended. After all, Mr. Hensley confronts the fate which uninsured motorist coverage was designed to prevent – having an uncollectible judgment against a tortfeasor who has no liability insurance coverage.

The Legion policy defined an uninsured motor vehicle as, among other things, a

vehicle which ostensibly has liability insurance coverage, but the insurance carrier has either denied coverage or been declared insolvent. And although the Legion policy provides that a self-insured vehicle is not "uninsured" (in the same sense that a vehicle covered by liability insurance is not uninsured), it also explicitly provides that a self-insured vehicle *is* uninsured if the self-insurer is insolvent. If the mere existence of a self-insured vehicle absolutely precludes the applicability of Legion's uninsured motorist coverage, *regardless of whether that self-insurance is available to the claimant,* then the reference to the insolvency of a self-insurer not only is confusing and contradictory, it is nonsensical.

Reading the contractual definition of uninsured motor vehicle in its entirety, including the exceptions and exclusions thereto, it is clear that the uninsured motorist coverage of the Legion policy was not intended to be inapplicable merely because the offending vehicle was self-insured. Exclusion of a self-insured car from the definition of an uninsured vehicle was simply to establish the obvious – that self-insurance has the same legal effect as insurance obtained from a third-party insurer. Similarly, the insolvency of a self-insurer has the same effect as the insolvency of an insurance company; in either event, the tortfeasor is uninsured. The *unavailability* of self-insurance – which is the situation before this court – presents the same situation as the *insolvency* of a self-insurer.

This Court is well aware that it cannot rewrite unambiguous contracts for the

9

parties, or substitute its opinion for what it believes should be in the contract. But that is not what this Court is doing. The policy's language that *seemingly* excludes a self-insured vehicle from the definition of an uninsured motorist vehicle simply makes no sense when read in light of the policy's other language regarding insolvency of a liability insurance carrier, or the insolvency of a self-insurer, or the unavailability of liability insurance due to a denial of coverage.

It is respectfully recommended that this Court declare that the Legion policy, for the reasons stated hereinabove, afforded uninsured motorist coverage to Mr. Hensley. Since Arkansas stands in Legion's shoes, at least to a certain extent, the Court must go further and determine if Mr. Hensley has a "covered claim" as defined by § 23-90-103 of the Arkansas Code. Arkansas strenuously insists that Mr. Hensley must file his claim against the Insurance Guaranty Fund in North Carolina where Mr. Hensley lives, whereas Mr. Hensley insists that he must pursue his claim against the Arkansas Guaranty Fund.[1] The danger implicit in the situation as it has now evolved is that if this Court ultimately should determine that Mr. Hensley should pursue his claim against the North Carolina Guaranty Fund and grants Arkansas's Motion for Summary Judgment, Mr. Hensley obviously will be required to file a claim against the North Carolina Fund. And if that Fund should determine that it has no responsibility and that

---

[1] Mr. Hensley's attorney noted during argument that representatives of the North Carolina Fund some time ago suggested that Mr. Hensley must pursue his claim against the Arkansas Fund.

plaintiff should pursue his claim against the Arkansas Fund, what then? Both the attorney for the Arkansas and plaintiff's attorney requested that this Court allow one or both of them to bring the North Carolina Fund before this Court and joined as a party to this action so that the rights and liabilities of all three parties can be determined in one forum, thereby eliminating the possibility that Mr. Hensley will lose his bid in this Court to recover from Arkansas, but also later lose his bid to recover against the North Carolina Fund. Assuming this Court is correct regarding its construction of the Legion policy and the applicability of its uninsured motorist coverage to Mr. Hensley, Mr. Hensley undeniably is entitled to recover from one fund or the other; he should not be required to run the risk of being turned away from both. Therefore, it is respectfully recommended that if either the plaintiff or Arkansas asks leave of Court to join the North Carolina Guaranty Fund as an additional defendant in this declaratory judgment action, such request should be GRANTED, and that further ruling on the parties' Motions for Summary Judgment be delayed for thirty days to allow either party to file such a motion. If no such motion is filed, the Magistrate Judge will proceed to consider the remainder of the parties' respective Motions for Summary Judgment.

Any objections to this report and recommendation must be filed within ten (10) days of its service or further appeal will be waived. 28 U.S.C. § 636(b)(1)(B) and (C). *United States v. Walters*, 638 F.2d 947-950 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S.

140 (1985). The objecting party shall procure and file simultaneously with the objections a transcript of any testimony before the Magistrate Judge. If a transcript is not filed simultaneously with the objections, the party filing the objections shall either (1) file a declaration that the transcript was ordered before the objections were filed and the date on which the party expects the transcript to be filed, **or** (2) affirmatively state that a transcript of the testimony presented to the Magistrate Judge is not needed for resolution of the objections. If a party files objections to this report and recommendation, the attorney for that party shall provide a copy of such objections to the opposing counsel on the same day the objections are filed, either by hand-delivery or facsimile transmission. The opposing counsel shall file his/her response to the objections within five business days of the date the objections are filed.

    Respectfully submitted,

                                            s/ Dennis H. Inman  
                                         United States Magistrate Judge